UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JONATHAN HASTINGS,

        Plaintiff,

    v.                              Case No. 18-C-1694

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

## DECISION AND ORDER AFFIRMING DECISION OF COMMISSIONER

Plaintiff Jonathan Hastings filed this action for judicial review of a decision by the Commissioner of Social Security denying his applications for disability insurance benefits under Title II and supplemental security income under Title XVI of the Social Security Act. Plaintiff argues that the administrative law judge's (ALJ) decision is flawed and requires remand because the ALJ (1) improperly relied on outdated medical opinions from state agency psychologists and (2) posed hypothetical questions to the VE that failed to appropriately consider Plaintiff's moderate limitations in concentration, persistence, or pace (CPP). For the reasons that follow, the decision of the Commissioner will be affirmed.

### BACKGROUND

Plaintiff filed an application for a period of disability and disability insurance benefits, and an application for supplemental security income on August 27, 2010, claiming an onset date of August 1, 2008. R. 229, 1021. He listed fibromyalgia, depression, anxiety, ADHD, IBS, and GERD as the physical or mental conditions that limited his ability to work. R. 234. After his applications were denied initially and on reconsideration, Plaintiff requested a hearing before an

ALJ. R. 103. A hearing was held before an ALJ in April 2012, but the decision denying the application was vacated by the Appeals Council and the case remanded because Plaintiff did not receive several exhibits submitted after the hearing. R. 31. Another hearing was held, and the application was again denied in a decision issued in March 2014. *Id.* Plaintiff filed an action for judicial review, but the Commissioner moved to voluntarily remand the case before briefing was completed. *See Hastings v. Colvin*, No. 1:15-cv-1015-WCG (E.D. Wis.), Dkt. Nos. 17–18. Plaintiff's third hearing with an ALJ was conducted by ALJ William Shenkenberg on December 1, 2016. Plaintiff, who had been represented by counsel at each of his hearings, testified; the ALJ also heard testimony from Plaintiff's mother, Sherilyn Hastings, and a vocational expert (VE). R. 1035. It is ALJ Shenkenberg's decision, issued on May 3, 2017, that is before the court for review. R. 1021.

By the time of the third hearing on his application before ALJ Shenkenberg, Plaintiff was thirty years old. R. 1059. He lived in Green Bay at his mother's home with her partner, both of whom were receiving disability. R. 1060–61. Plaintiff has never lived outside of his parents' homes. R. 1071, 1095. He completed the eleventh grade of high school, dropping out during his senior year. R. 1062. Plaintiff later received his GED in 2005. R. 1063. From preschool until high school, Plaintiff spent part of his school day in special education classes due to his attention span and difficulties understanding others. R. 1063–64. In high school, he spent the entire day in special education classes; he recalls receiving mostly Ds and Fs for a GPA of about 0.5. R. 1064–65. Plaintiff attended college for a single semester, studying networking. R. 1065.

On a typical day, Plaintiff testified that he experiences sleep trouble due to his constant pain; he falls asleep at 5:00 a.m. or 6:00 a.m. and sleeps until noon. R. 1066, 1078–79. After waking, Plaintiff experiences pain throughout his body, including his shoulders, back, and hands.

R. 1067. He states this daily pain causes him fatigue and feels like stabbing needles. R. 1068. Due to the pain, he showers only every couple days and shaves only every couple weeks. *Id.* Plaintiff testified he has experienced this level of pain since 2010. *Id.*

Plaintiff testified about three concussions he suffered. He testified that at age five or six, he fell from a bike, blacked out, and awoke in the hospital. R. 1069. At age 10 or 12, he said he slipped on the ice while biking; he became nauseated and was taken to the hospital. *Id.* At age 20, Plaintiff said he was jumped by four people who kicked him while he was on the ground; he again lost consciousness and woke up in the hospital. R. 1070. He reports these concussions have affected his memory and thinking ability. *Id.*

Plaintiff testified he also suffers from severe anxiety and panic attacks. R. 1071. He said he becomes nervous, shaky, and nauseated or feels like he will pass out. *Id.* His anger also causes him to black out, punch, throw, and break things (such as doors in his house), scream, and yell. R. 1072. He has never become physical with his mother, but has struck his sister. *Id.* In August 2012, Plaintiff was admitted for a possible suicide attempt after overdosing on Xanax; in August 2014, he was admitted for four days for anger episodes and was later admitted for an additional three days with suicidal thoughts; and in September 2014, he was admitted overnight due to suicidal ideation. R. 1011. He has a family history of bipolar disorder. R. 638, 1391.

The last job Plaintiff held was as a cashier at a gas station convenience store, which lasted for about six months. R. 1072–74. At about age 20, Plaintiff tried working for family members, including shoveling asphalt, but faced difficulties due to his forgetfulness and level of quickness. R. 1074. At other points, Plaintiff worked as a restaurant delivery driver and dishwasher. R. 1075–76. He was a dishwasher at a Perkins restaurant, working about 20 hours a week, but the manager told him he was spacing out. In total, Plaintiff worked about seven shifts over the three weeks he

3

was employed there. R. 1076, 1109. He could not work there for more than six hours in a row due to pain. R. 1077. The dishwashing caused pain to his back, resulting in hospitalization. R. 1076–77. Plaintiff thought he was never able to lift more than ten pounds at a time while working at Perkins. R. 1084.

Plaintiff's mother is in charge of his medication due to his forgetfulness and inability to keep track of how much he has taken. R. 1071. At the time of the hearing, he was taking Gabapentin, Lyrica, Setraline, and Tramadol. R. 1077. Plaintiff has had a driver's license since age 17, but now only drives about once a month due to seizures and previous car accidents. R. 1092. Plaintiff testified that he experiences seizures about once every six months. R. 1093. He says his seizures range from 30 minutes to a couple of hours; he loses consciousness and is unable to move. *Id.*

Plaintiff testified that his symptoms limit his daily activities. R. 1100. He tries to do chores and sometimes he takes out the garbage. R. 1098, 1106. He reads periodically and plays guitar about 10 minutes a week. R. 1102, 1104. He watches television during the day, but cannot sit for long periods of time. R. 1106.

In a twenty-two-page decision dated May 3, 2017, the ALJ concluded that Plaintiff was not disabled. R. 1000–21. The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA). At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2011 (with a gap occurring from October 1, 2010 through December 31, 2010), and had not engaged in substantial gainful activity since August 1, 2008. R. 1003. The ALJ noted Plaintiff collected minimal earnings, posting $1,435 in 2011, $398 in 2012, and an estimated $170 per week for three weeks in 2016. R. 1003. At step two, the ALJ determined that Plaintiff had the following

4

severe impairments: lumbar and cervical spine degenerative disc disease, fibromyalgia, obesity, anxiety disorder, panic disorder, attention deficit hyperactivity disorder, major depressive disorder in remission, a history of benzodiazepine abuse, a history of a learning disorder, and borderline cognitive functioning. *Id.* At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 1004.

The ALJ then assessed Plaintiff's RFC, concluding that he can perform light exertional work with the following findings and limitations:

> except the claimant can occasionally climb ladders, ropes and scaffolds; occasionally climb ramps and stairs; and, frequently balance, stoop, kneel, crouch and crawl. The claimant is able to understand, remember, and carry out simple instructions and perform simple and routine tasks; work in a low stress job defined as having only occasional decision making, changes in the work setting and judgment. The claimant is unable to perform production rate or pace work. The claimant is able to have brief and incidental interaction with the public and occasional interaction with coworkers and supervisors. The claimant is able to maintain concentration, persistence and pace in two hour increments, consistent with normal breaks and lunch and consistent with unskilled work.

R. 1006. At step four, the ALJ found that Plaintiff had no past relevant work. R. 1020. The ALJ asked the VE to testify as to whether jobs existed in the national economy given Plaintiff's age, education, work experience, and RFC; the VE testified that Plaintiff would be able to perform in light SVP 2 occupations (such as an inspector) and as a sorter or merchandise marker. R. 1020. Accordingly, at step five, the ALJ concluded that Plaintiff was not disabled. R. 1021. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. R. 978.

## LEGAL STANDARD

Plaintiff is entitled to disability benefits under Title II of the Social Security Act if he became disabled before the date he was last insured. 42 U.S.C. § 423(a)(1). To receive SSI under

Title XVI of the Social Security Act, Plaintiff must be disabled and have limited means. 42 U.S.C. §§ 1381(a), 1382. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs that the claimant can perform exist in significant numbers in the national economy shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, there is no objective test that can distinguish between those impairments that render a person incapable of full-time work from those that merely make such work more difficult. Finally, placing the burden of proof on the claimant makes sense because some people may be inclined to seek the benefits that come with a finding of disability when better paying or otherwise attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of the Social Security Administration. Judicial review of the decisions of the Commissioner, like judicial review of administrative agencies in general, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial

6

evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof. In other words, a finding that the claimant is not disabled can also follow from a lack of persuasive evidence.

Nor does the test require that the Commissioner cite conclusive evidence excluding any possibility that the claimant is unable to work. Such evidence, in the vast majority of cases that proceed to a hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court recently reaffirmed that "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the

7

ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

Plaintiff claims that the ALJ erred in assessing his mental RFC. Importantly, though much of his testimony at the hearing concerned limitations caused by the physical pain he attributed to his degenerative disc disease and fibromyalgia, Plaintiff does not claim that the ALJ erred in assessing his physical RFC. As a result, any such challenge is now considered waived. *See Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established in our precedents that skeletal arguments may be properly treated as waived, . . . as may arguments made for the first time in reply briefs."). The only issue before the court concerns the ALJ's assessment of Plaintiff's mental RFC.

8

**A. Weight Afforded to Opinions of State Agency Psychologists**

Plaintiff argues that the ALJ erred by giving any weight to the state agency psychologists' opinions because they were outdated. Pl.'s Br. at 10. The state agency psychologists, Dr. Beth Jennings and Dr. Kyla King, reviewed Plaintiff's medical record in August 2010 and April 2011, respectively. R. 703, 755. Dr. Jennings concluded that Plaintiff was "capable of performing the basic demands of unskilled work." R. 704. Dr. King likewise concluded that Plaintiff's mental impairment did not render him disabled:

> Based on all the medical evidence, claimant has the ability to understand, remember and carry out simple job instructions. He has moderate limitations in his social functioning and in his ability to concentrate, persist and maintain pace. He retains the capacity for unskilled work. His mental allegations are fully credible but do not result in disability.

R. 755. The ALJ recognized that the opinions offered by Dr. Jennings and Dr. King were from 2010 and 2011. He nevertheless gave them "some weight" because "their assessments were in keeping with the medical evidence and the claimant's activities throughout the period." R. 1015. Plaintiff contends this was reversible error.

It is error for an ALJ to "rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018) (citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (remanding where a later diagnostic report "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment"); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (remanding after ALJ failed to submit new MRI to medical scrutiny)); *see also Akin v. Berryhill*, 887 F.3d 314, 317 (7th Cir. 2018) (holding ALJ erred in crediting the state-agency opinions, which were outdated and missing

9

approximately 70 pages of medical records, including MRI results).  But the mere fact that a claimant undergoes further treatment after an evaluation does not render an evaluation worthless.

Unfortunately, as a result of the two previous remands, by the time ALJ Shenkenberg heard the case, more than six years had elapsed since either psychologist had reviewed the record. Generally, as is the case here, claimants continue to receive treatment and thereby add to the medical record up to and even after the date of the administrative hearing, which occurs long after the state agency physicians reach their opinions.  In this case, for example, the third hearing on Plaintiff's application was held some ten years after his alleged onset date and more than eight years after his application.  "If an ALJ were required to update the record any time a claimant continued to receive medical treatment, a case might never end." *Keys v. Berryhill*, 679 F. App'x 477, 480–81 (7th Cir. 2017) (citing *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)).  Thus, it is only when it is shown there is "later evidence containing new, significant medical diagnoses" that could reasonably have changed the reviewing physician's opinion that an ALJ's reliance on an earlier opinion is error.  *Moreno*, 882 F.3d at 728.

Here, the ALJ gave only "some weight" to the opinions of Drs. Jennings and King. R. 1014.  He also gave "some weight" to the opinions of the two consulting examiners who likewise offered their opinions before the initial remand.  Dr. Steve Krawiec issued his report in April 2011, and neuropsychologist Dr. Julie H. Bobholz issued her report in late 2009.  R. 1015–16 (citing R. 746–50, 386–89).  The ALJ explained why, despite the fact that these opinions were offered years prior to the hearing and the additional treatment Plaintiff had received, they were nevertheless entitled to "some weight."  In essence, he explained that the opinions offered by these psychologists were consistent with the medical record he reviewed and Plaintiff's daily activities. *Id.*

10

Plaintiff strenuously argues that the opinions of Drs. Jennings and King were entitled to no weight and that the ALJ should have sought fresh opinions. However, he fails to cite any "later evidence containing new, significant medical diagnoses [that] reasonably could have changed the reviewing physician's opinion," *Moreno*, 882 F.3d at 728, such that even giving them "some weight" would be considered error. Indeed, when ALJ Shenkenberg began what was Plaintiff's third hearing, he noted that the last decision was March 21, 2014, and asked whether there were any new impairments. Plaintiff's attorney responded: "No new impairments since that time. There's been some worsening, but, no, his impairments have all been steady since -- really since 2010. He's had basically the same impairments or even before that, your honor." R. 1045. Even before that, Plaintiff's attorney had advised the ALJ that Plaintiff's doctors from back in 2010 continuing to 2016 all said the same thing: "He is not able to work." R. 1040. Given these representations, it is difficult to fault the ALJ for failing to seek out additional opinions at that stage.

It is also reasonable to ask why, if Plaintiff felt his more recent treatment records provided further support for his claim, he did not offer opinions by his treating psychiatrist or psychologist. The ALJ found it significant that "no treating mental health expert has offered a medical source statement on the claimant's mental or social functioning." Plaintiff did offer the opinion of his family doctor in support of his claim, but the ALJ explained at length why he afforded it little weight. R. 1017–19. Plaintiff does not challenge the ALJ's assessment of this family doctor.

Finally, it is important to note that the ALJ did not simply rely on the opinions of the reviewing and examining psychologists, which he only afforded "some weight," in reaching his conclusions. His decision also includes a thorough discussion of the entire record and an analysis of the evidence. In the end, the ALJ concluded that Plaintiff's own description of his regular

11

activities, his positive response to medication (when compliant), and past performance in school, including a year of college, and his performance on testing, indicated a capacity to perform work within the RFC he formulated. R. 1010–14. The opinion evidence on Plaintiff's mental RFC provided further support for the ALJ's determination that Plaintiff was capable of the limited range of light work he described.

Plaintiff accuses the ALJ of "playing doctor" because he analyzed this evidence in formulating Plaintiff's RFC. He relies on *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018), for the proposition that "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." Pl.'s Br. at 16. But *Lambert* concerned the ALJ's improper interpretation of x-rays and other medical imaging without the assistance of a medical expert. 896 F.3d at 744. In this case, Plaintiff cites no imaging studies or other medical data that the ALJ impermissibly interpreted and instead argues that the ALJ improperly reviewed the treatment notes of his medical providers. But that is precisely what an ALJ is supposed to do. When a case proceeds to an administrative hearing, "the administrative law judge or the administrative appeals judge at the Administrative Council (when the Appeals Council makes a decision) is responsible for assessing [the claimant's] residual functional capacity." 20 C.F.R. § 404.1546(c). Of course, the ALJ must consider the opinions of acceptable medical sources in arriving at the RFC. *Id.* at § 404.1546(a)(3). Far from playing doctor, the ALJ in this case fulfilled his role as ALJ when he reviewed the medical evidence to formulate Plaintiff's RFC. Plaintiff asserts that the ALJ's findings merely cherry-picked the record and essentially asks that I reweigh the evidence and overrule the ALJ's opinion. This is not the law, however. Judicial review is intended to be deferential and the final decision of the Commissioner will be upheld if the ALJ applies the correct legal standards and supports his decision with substantial evidence. 42 U.S.C.

12

§ 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).  The ALJ did not err in giving some weight to the opinions of Drs. Jennings and King, and substantial evidence supported the ALJ's RFC finding.  Accordingly, I find no error on these grounds.

### B.  Hypothetical Questions Posed to the VE

Plaintiff also argues that the ALJ's hypothetical questions posed to the VE failed to adequately address his moderate limitations in CPP.  A claimant's RFC specifies the most that a claimant can do despite the limitations caused by his physical and mental impairments.  20 C.F.R. § 404.1545(a)(1).  The SSA uses a "special technique" to evaluate the severity of mental impairments.  *Id.* § 404.1520a.  The special technique is intended to "(1) Identify the need for additional evidence to determine impairment severity; (2) Consider and evaluate functional consequences of the mental disorder(s) relevant to [the claimant's] ability to work; and (3) Organize and present [the SSA's] findings in a clear, concise, and consistent manner."  *Id.* § 404.1520a(a).  The regulations describe how the special technique operates.  It requires first an evaluation of the claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable impairment.  *Id.* § 404.1520a(b)(1).  If a mental impairment is found, the SSA then rates the degree of functional limitation resulting from it in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  *Id.* § 404.1520a(c)(3), (4).  These four functional areas comprise paragraph B criteria for the mental impairment listings.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders.  The area of "concentration, persist, or maintain pace" refers to the claimant's "abilities to focus attention on work activities and stay on task at a sustained rate." *Id.* § 12.00(E)(3).

13

The degree of limitation in the first three areas is rated on a five-point scale: none, mild, moderate, marked, and extreme. The regulations explicitly define these terms:

a. No limitation (or none). You are able to function in this area independently, appropriately, effectively, and on a sustained basis.
b. Mild limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.
c. Moderate limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.
d. Marked limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.
e. Extreme limitation. You are not able to function in this area independently, appropriately, effectively, and on a sustained basis.

*Id.* § 12.00(F)(2). The regulations make clear that "the greatest degree of limitation of any part of the area of mental functioning directs the rating of limitation of that whole area of mental functioning":

(i) To do a work-related task, you must be able to understand *and* remember *and* apply information required by the task. Similarly, you must be able to concentrate *and* persist *and* maintain pace in order to complete the task, and adapt *and* manage yourself in the workplace. Limitation in any one of these parts (understand *or* remember *or* apply; concentrate *or* persist *or* maintain pace; adapt *or* manage oneself) may prevent you from completing a work-related task.
(ii) We will document the rating of limitation of the whole area of mental functioning, not each individual part. We will not add ratings of the parts together. For example, with respect to paragraph B3, if you have marked limitation in maintaining pace, and mild or moderate limitations in concentrating and persisting, we will find that you have marked limitation in the whole paragraph B3 area of mental functioning.
(iii) Marked limitation in more than one part of the same paragraph B area of mental functioning does not satisfy the requirement to have marked limitation in two paragraph B areas of mental functioning.

*Id.* § 12.00(F)(3)(f). The degree of limitation for episodes of decompensation is rated on a four-point numerical scale: none, one or two, three, four or more. 20 C.F.R. § 404.1527(c)(4). These ratings are then used to determine whether the mental impairment is severe (Step 2) and, if so, whether it meets the criteria of one of the listings for mental impairments (Step 3).

14

If a claimant has had no episodes of decompensation and the first three functional areas are rated none or mild, the SSA generally concludes that the claimant does not have a severe mental impairment. *Id.* § 404.1520a(d)(1). If any of the first three functional areas are rated moderate or above, or if the claimant had one or more episodes of decompensation, the mental impairment is considered severe and the SSA then determines whether it meets or is equivalent in severity to a listed mental impairment. If a claimant's impairment meets or medically equals the criteria for one of the listed impairments, the individual is deemed disabled at Step 3 of the SSA's sequential evaluation process. *Id.* § 404.1520(d)(2). If, however, a mental impairment is severe, but does not meet or medically equal a listed impairment, then a more particularized assessment is made of the claimant's mental RFC. *Id.* § 404.1520a(d)(3). It is therefore important to note what the term "moderate" is intended to mean in this context. A "moderate" rating is not in and of itself an RFC finding but is an indicator that the ALJ must assess the claimant's residual functional capacity that captures the claimant's functional limitations. *See id.*

To document the application of the special technique, the SSA has created an electronic form called the Psychiatric Review Technique (PRT), which is completed by the State agency medical or psychological consultant at the initial or reconsideration level of the administrative review process. *Id.* § 404.1520a(e)(1). At a hearing on the claim, the ALJ is required to incorporate the pertinent findings and conclusions on the PRT into his or her written decision. *Id.* § 404.1520a(e)(4). A second form, the Mental Residual Functional Capacity Assessment (MRFCA), is used to document the more detailed evaluation that is required when the claimant's mental impairment, though severe, does not meet or exceed the criteria of a listing and a mental RFC must be determined. The use of these forms is explained in the SSA's Program Operations

Case 1:18-cv-01694-WCG   Filed 06/01/20   Page 15 of 22   Document 24

Manual System (POMS), which is available at https://secure.ssa.gov/apps10/poms.nsf. *See* POMS DI 24505.025; DI 24510.060.

SSA adjudicators are told that the limitations they identify using the PRT are "not an RFC assessment" but are instead "used to rate the severity of the mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). As the Ruling makes clear, "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF." *Id.* It is the more detailed assessment of the various functions set forth in the MRFCA form, as well as the other evidence in the record bearing on the issue, that the ALJ looks to in formulating a claimant's mental RFC. It is also important to note that where a case proceeds to a hearing, it is the responsibility of the ALJ, not the medical experts, to assess the claimant's RFC. 20 C.F.R. § 404.1546(c). Although the ALJ must consider opinions from medical sources in assessing issues such as a claimant's RFC, "the final responsibility for deciding these issues is reserved to the Commissioner." *Id.* § 404.1527(d)(2).

In this case, the ALJ properly applied the special technique and followed the sequential evaluation process in evaluating Plaintiff's mental impairments. He found that Plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.11. The ALJ found for the paragraph B criteria that Plaintiff had moderate limitation in understanding, remembering, or applying information; in interacting with others; with regard to concentrating, persisting, or maintaining pace; and in adapting or managing oneself. R. 1004–06. He noted that, because Plaintiff's mental impairments do not cause at least

two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied. R. 1006. Although these findings did not meet the criteria for the listings considered, they did indicate that Plaintiff's mental impairments were severe and that a mental residual functional capacity evaluation was needed. The ALJ then noted:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental functional analysis.

*Id.*

The ALJ then explained how he assessed Plaintiff's RFC. His assessment was more detailed to Plaintiff's work abilities than the moderate limitations of the "paragraph B" criteria he found. The ALJ relied on the opinions of Drs. Bobholz, Jennings, and King, Plaintiff's medical records, and Plaintiff's activities of daily living in forming the RFC.

Dr. Jennings and Dr. King completed MRFCA forms in their assessment of Plaintiff's mental impairments. Section I of the form contains checkboxes for "recording summary conclusions derived from the evidence in the file." R. 701. Dr. Jennings indicated in that section of the form that Plaintiff was moderately limited in the ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with

coworkers or peers without distracting them or exhibiting behavioral extremes. R. 701–02. Dr. Jennings concluded that Plaintiff retained the capacity for unskilled work. R. 704.

Dr. King found that Plaintiff was moderately limited in his ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. R. 753–54. Dr. King explained that, "[b]ased on all the medical evidence, claimant has the ability to understand, remember and carry out simple job instructions. He has moderate limitations in his social functioning and in his ability to concentrate, persist and maintain pace. He retains the capacity for unskilled work. His mental allegations are fully credible but do not result in a disability." R. 755. Consistent with the opinions of Drs. Jennings and King, the ALJ imposed additional limitations to address Plaintiff's reports of difficulties with completing tasks, maintaining pace and handling change with the additional restrictions to occasional decision-making, changes, judgment, and no production and pace work. R. 1015.

Dr. Bobholz completed a neuropsychological evaluation in 2009. She opined that Plaintiff would struggle most in jobs that require him to learn new tasks, focus on details, or manage problem solving situations. She also explained that his tendency to be inattentive puts him at

higher risk for errors. R. 386–89. The ALJ explained that he created the RFC finding to account for these concerns by restricting Plaintiff to only routine tasks and to dealing with only simple instructions and tasks, and restricting the pace of work Plaintiff could perform. The ALJ also restricted Plaintiff to a low-stress job, with only occasional judgment, decision making, and changes in work setting. R. 1016.

Based upon these reports, but also on all of the evidence in the record, the ALJ found that Plaintiff had the RFC to perform a range of light work that was limited due to Plaintiff's mental impairments: "The claimant is able to understand, remember, and carry out simple instructions and perform simple and routine tasks; work in a low stress job defined as having only occasional decision making, changes in the work setting and judgment. The claimant is unable to perform production rate or pace work. The claimant is able to have brief and incidental interaction with the public and occasional interaction with coworkers and supervisors. The claimant is able to maintain concentration, persistence and pace in two hour increments, consistent with normal breaks and lunch and consistent with unskilled work." R. 1006.

Plaintiff argues that the ALJ erred because neither his RFC nor the hypothetical questions posed to the VE accounted for his moderate limitations in CPP. In particular, Plaintiff asserts that the ALJ failed to specifically address his moderate limitations in CPP and that the ALJ failed to incorporate additional limitations that the reviewing psychologists noted in their evaluations. The Seventh Circuit has recognized that there is no per se requirement that the ALJ use the magic words "concentration, persistence, and pace" in every case. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). Although Plaintiff dissects certain aspects of the RFC to suggest that the ALJ did not contemplate limitations in CPP, he clearly ignores that the ALJ did use the

19

specific words "concentration, persistence, and pace" in the RFC and hypothetical question posed to the VE.  R. 1006, 1125–26.

Although the court need not consider whether alternative phrasing would be sufficient, since the ALJ did use the "magic words" in formulating the RFC, the court will address Plaintiff's separate argument that the ALJ did not properly incorporate the findings of the state agency psychologists into the hypothetical question.  Citing *Varga v. Colvin*, 794 F.3d 809 (7th Cir. 2015), Plaintiff asserts that restricting him to simple and routine tasks was insufficient to accommodate his moderate limitations in CPP.  In *Varga*, the ALJ found that the plaintiff had moderate limitations in CPP and in various functional areas within that broader category, but then adopted an RFC that only limited her to "simple, routine, and repetitive tasks in a work environment free of fast paced production requirements."  *Id.* at 811–13.  The problem in *Varga*, however, was that the doctor's narrative RFC was missing, and the court held that, under those circumstances, it was improper for the ALJ to not rely on the worksheet observations.  *Id.* at 816.  But the court in *Varga* explicitly recognized that, "in some cases, an ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates and translates those worksheet observations."  *Id.* (citing *Johansen v. Barnhart*, 314 F.3d 283, 286 (7th Cir. 2002)).  In other words, when the examiner's narrative is included and is not inconsistent with the worksheet findings, the ALJ may reasonably rely on it.  *See Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019) ("[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination." (citation omitted); *Dudley v. Berryhill*, 773 F. App'x 838 (7th Cir. 2019) (observing that plaintiff "mistakenly presumes that the psychologists' answers to the checklist section outweigh the narrative opinion section").

Plaintiff's argument also ignores the fact that the agency has revised the rules governing the evaluation of mental impairments. The new regulations became effective in January 2017 and apply to the ALJ's decision in this case. *See SSA, Revised Medical Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66138, 66147 (Sept. 26, 2016). The new regulations clarify the "special technique" and overall procedure used by consultants and ALJs to assess mental impairments. Importantly, the new regulations also make clear that a "moderate" limitation in a functional area means "[the claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2). As the Commissioner points out, the word "'Fair' is generally understood to mean 'sufficient but not ample' or 'adequate.' Merriam Webster's Collegiate Dictionary 417 (10th Ed. 1996). *See also* Black's Law Dictionary (10th Ed. 2014) (defining 'fair' as 'reasonably good in kind, quality, or degree'); Cambridge Academic Content Dictionary (defining fair as 'average: neither very good nor very bad')." Def.'s Mem. in Support, Dkt. No. 20, at 6 n.5. This clarification is especially important because the cases on which Plaintiff relies were decided before the regulations explicitly defined what moderate was intended to mean. *See, e.g.*, *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016) (noting "[a]gency regulations, as far as we can tell, do not quantify what is meant by a 'moderate' restriction"). Plaintiff fails to address these changes.

In this case, the ALJ reasonably relied on the opinions of Drs. Jennings and Bobholz and Dr. King, who translated her Section I findings in her narrative section, and encapsulated the limitations the consultants identified in the RFC. He not only articulated limitations related specifically to CPP but also included a detailed set of functional work-related limitations. The ALJ's RFC determination is consistent with the medical opinions offered in this case. Because substantial evidence in the record supports the Commissioner's decision, it must be affirmed.

**CONCLUSION**

For these reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed

to enter judgment in favor of the Commissioner.

Dated at Green Bay, Wisconsin this 30th day of May, 2020.

s/ William C. Griesbach
William C. Griesbach, District Judge
United States District Court